## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Monty Jones,

               Plaintiff,

v.

Aeon and Affiliates, Juanita Sealy,
Tai Giwa, and Megan Cihra,

               Defendants.

Civ. No. 19-2803 (DSD/BRT)

**ORDER AND
REPORT AND RECOMMENDATION**

---

This matter comes before the Court on Plaintiff Monty Jones's Complaint (Doc. No. 1), and Application to Proceed in District Court Without Prepaying Fees or Costs (Doc. No. 2, IFP Application). For the following reasons, the Court grants the IFP Application and orders Jones to provide service-related information for the Defendants but recommends the dismissal of much of the Complaint.

**I.     BACKGROUND**

Jones's Complaint concerns his treatment while living at the Elm's Apartments complex in Minneapolis, Minnesota. (*See* Compl. 4–6.)[1] The Complaint names four Defendants. (*See id.* at 1.) As the Court understands it, Defendant Aeon and Affiliates ("Aeon") manages Elm's Apartments. (*See id.* at 5.) The other Defendants—Juanita

---

[1]     Because the Complaint is not consecutively paginated, references to it use the page numbers supplied by the Court's CM/ECF filing system.

Sealy, Tai Giwa, and Megan Cihra—appear to be Aeon employees who work at Elm's Apartments. (*See id.* at 4–6.)

The Complaint recounts numerous conflicts between Jones and Defendants. Jones, an African-American, moved into Elm's Apartments in December 2017. (*See id.* at 4.) In February 2018, "noise and traffic" from other apartment residents began to disturb him. (*See id.*) He complained repeatedly to building management, and while at least one staff member was helpful, Jones believed that Giwa and another staff member "ignored [him]" because "they were racist towards African-Americans."[2]

After repeated instances of allegedly being ignored by apartment management, Jones filed a "Neighbor Violation Complaint" in September 2018. (*See id.*) Later that month, Giwa informed Jones that the relevant "tenants would be moving in October." (*Id.*) Notwithstanding that assurance, "loud noise" continued until the tenants finally moved out in mid-December 2018. (*Id.*)

Things were calm until mid-January 2019, when new tenants moved into the room above Jones. (*See id.*) The new tenants were "really loud," generating "[a] lot of traffic and constant stomping." (*Id.*) Jones called the police twice, but "management [did] nothing." (*Id.*) In April 2019, a boyfriend of one of the new tenants apparently threatened Jones, and Jones reported the threat to Giwa. (*See id.*) According to Jones, Giwa "side[d] with the loud tenants" and Jones got a letter from "their lawyer"—which the Court assumes means the apartment complex's lawyer. (*Id.*) Jones contends that this letter was

---

[2]  The other staff member Jones names here—Peace Maduista—is not named as a Defendant. (*Compare* Compl. 1 *with id.* at 4.)

"pure defamation of character." (*Id.*; *see also id.* at 5 (appearing to describe same incident).)

In April 2019, Giwa gave Jones the option of moving to another apartment complex. (*See id.* at 5.) Jones met with two employees of the new complex; one indicated that she was willing to rent Jones an apartment. (*See id.*) In a confusing allegation, Jones states that Giwa "knew all this but yet sends me a letter telling me since I didn't want to move into the apartment in Richfield, I could move still." (*Id.*) Jones says that he complained to Giwa that her actions were "pure retaliation." (*Id.*)

In May 2019, Jones was given the opportunity to move into the apartment above his own; he agreed to do so, and moved in June 2019. (*See id.*) According to Jones, "noise and traffic" began again in August; he again complained to management, but "with the exception of one e-mail," Jones got no response. (*Id.*) At some point in August, a "SWAT team raided a unit on [Jones's] floor," which Jones takes as evidence that his complaints "were with merit." (*Id.*) Throughout August, September, and October 2019, Jones continued to inform building management about noise issues, but his concerns were ignored. (*Id.*)

During this same timeframe, Jones also complained to apartment management about a mice infestation in his apartment and "holes that need[ed] to be sealed up." (*See id.*) "Pest control" left traps in the apartment in September 2019, but this did not stop the infestation, and the holes went unfixed. (*Id.*)

In October 2019, Jones told Cihra in an email that he believed that he was "being treated in a racist manner." (*Id.* at 6.) Cihra sent this email to Giwa. (*See id.*) This

3

apparently led to a later interaction in which Jones told Giwa that Cihra "had reacted in a racist manner." (*Id.*) After Jones sent that email, Giwa indicated that she and Sealy (Giwa's supervisor) wanted to meet with Jones. (*See id.*)

That meeting took place the next day. (*See id.*) Sealy was apparently 45 minutes late, and during that time, Jones claims, Giwa "harass[ed] [him] and defame[d] [his] character." (*Id.*) This purported defamation continued once Sealy arrived, and Jones claims that this nearly led to his eviction. (*See id.*) While Jones was not actually evicted at the meeting, he claims that he was forced to sign a "mutual termination agreement" under which he would leave Elm's Apartment by December 31, 2019. (*Id.*)

Jones claims that traffic and noise from his neighbors has continued, "primarily at night and the early morning hours." (*Id.*) He says that he suffers from "sever[e] migraine headaches" and that his "high blood pressure is being elevated." (*Id.*) He also reports that he no longer "feel[s] comfortable communicating with management" at Elm's Apartments because he believes that any negative interaction could lead to his eviction under the terms of the mutual termination agreement. (*Id.*)

For relief, the Complaint seeks $5,000 in compensatory damages; $5,000 in "moving expenses"; and $10,000 in punitive damages. (*Id.* at 7.)

## II. ANALYSIS

### A. Screening Standards

Rather than pay this action's filing fee, Jones moved for permission to proceed in forma pauperis ("IFP") in this action. (*See* IFP Appl.) After review, the Court concludes that Jones qualifies financially for IFP status. But an IFP application will be denied, and

4

an action dismissed, when an IFP applicant has filed a complaint that fails to state a cause of action on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii); *Atkinson v. Bohn*, 91 F.3d 1127, 1128 (8th Cir. 1996) (per curiam); *Carter v. Schafer*, 273 F. App'x 581, 582 (8th Cir. 2008) (per curiam) ("[T]he provisions of 28 U.S.C. § 1915(e) apply to all persons proceeding IFP and are not limited to prisoner suits, and the provisions allow dismissal without service."). The Court must therefore determine whether the Complaint states a cause of action for which this Court can grant relief.

In reviewing whether a complaint states a claim on which relief may be granted, this Court must accept the complaint's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *See Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008). The complaint's factual allegations need not be detailed, but they must be enough to "raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. In assessing a complaint's sufficiency, the court may disregard legal conclusions couched as factual allegations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Pro se complaints are to be construed liberally, but must still allege sufficient facts to support the claims advanced. *See Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004) (citing cases).

### B.  Causes of Action

Jones does not specify the causes of action he means to press against Defendants. To determine whether Jones states a claim upon which this Court can grant relief, the

Court must thus consider what causes of action the Complaint's allegations could potentially support.

When asked the basis for federal-question jurisdiction over this action, Jones states "Housing Accommodations" and "Title VII." (Compl. 3.) For the reference to "Housing Accommodations," the Court construes Jones as referring to the Fair Housing Act ("FHA") – that is, Title VIII of the Civil Rights Act of 1968, which presently appears at 42 U.S.C. §§ 3601–19. As for the "Title VII" reference, this is unclear, but the Court will assume that Jones means to refer to Title VII of the Civil Rights Act of 1964 (Title VII), which presently appears at 42 U.S.C. §§ 2000e to 2000e-17. The Court will therefore consider whether Jones has stated a cause of action against Defendants based on the FHA and Title VII.

At one point in the Complaint, Jones alleges that Defendants retaliated against him based on his claims of racist treatment, and also because of his complaints about noise and mice. (*See* Compl. 6.) The FHA and Title VII each have antiretaliation provisions. *See* 42 U.S.C. § 3617 (FHA); 42 U.S.C. § 2000e-3 (Title VII). The Court will therefore address whether Jones has stated a cause of action against Defendants based on these provisions.

Finally, Jones makes numerous references to defamation by letters and/or statements by Aeon and Giwa. (*See* Compl. 4, 6.) The Court construes these as assertions that Aeon and Giwa engaged in conduct qualifying as defamation under Minnesota law.

## C. Fair Housing Act

The Court will now address the Complaint's potential causes of action, starting with its potential FHA claims. The FHA provision most relevant to Jones's allegations is 42 U.S.C. § 3604. In relevant part, § 3604 makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race . . . ."

Section 3604(b) claims can arise under a disparate-treatment theory or under a disparate-impact theory. In a disparate-treatment case, a plaintiff "must establish that the defendant had a discriminatory intent or motive," while in a disparate-impact case, a plaintiff "challenges practices that have a disproportionately adverse effect on minorities and are otherwise unjustified by a legitimate rationale." *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2513 (2015) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (internal quotation marks omitted)); *see also Hoyt v. City of St. Anthony Vill.*, No. 18-CV-2434 (PJS/ECW), 2019 WL 2212147, at *6–8 (D. Minn. May 22, 2019) (discussing both theories). The Complaint does not allege that Defendants are engaging in some practice that disproportionately affects African-Americans; instead, Jones claims that he is being discriminated against personally. The Court thus construes Jones's § 3604(b) claim as one of disparate treatment.

To state a disparate-treatment claim under § 3604(b), a plaintiff must "plausibly allege that defendants acted with discriminatory intent." *Hoyt*, 2019 WL 2212147, at *7 (citing *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1112 n.3 (8th Cir. 2017)). In *Hoyt*, a

7

court in this District found that the plaintiffs had not plausibly alleged discriminatory intent where the discrimination allegations were "purely conclusory," the plaintiffs had "not identif[ied] any similarly situated comparators who were treated more favorably," and the plaintiffs had alleged no other "facts that would give rise to an inference of discriminatory intent." *Id.*; *see also Hayes v. City of Saint Paul*, No. 16-CV-2926 (DWF/SER), 2017 WL 3382060, at *6 (D. Minn. May 18, 2017) (dismissing FHA claim for similar allegations), *report and recommendation adopted*, 2017 WL 3381844 (D. Minn. Aug. 4, 2017).

The § 3604(b) claims in Jones's Complaint have the same problems. Jones claims that certain Defendants treated him in racist fashion, but those claims are conclusory. Such conclusory allegations need not be accepted as true when reviewing a complaint. *See, e.g.*, *Iqbal*, 556 U.S. at 678; *Swanson v. Wilford, Geske, & Cook*, No. 19-CV-117 (DWF/LIB), 2019 WL 4575826, at *10 (D. Minn. Aug. 30, 2019) (quoting *Iqbal*), *report and recommendation adopted*, 2019 WL 4573252 (D. Minn. Sept. 20, 2019). Furthermore, Jones does not point to any individuals of different races who engaged in conduct like his, but were treated more favorably. Nor does he point to any facts giving rise to an inference of discriminatory intent. Jones has not sufficiently alleged that Defendants acted with discriminatory intent; as a result, the Court recommends dismissing Jones's claims under § 3604(b).

This leaves Jones's potential claims of retaliation under the FHA. Under 42 U.S.C. § 3617, "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any

right granted or protected by [§§ 3603–06] of this title." To state a § 3617 claim, a plaintiff must show that "(1) [he] engaged in a protected activity; (2) [a defendant] was aware of the activity; (3) [a defendant] took adverse action against [the plaintiff]; and (4) there is a causal link between the adverse action and the protected activity." *United States v. Edmunds*, No. 15-CV-2705, 2016 WL 7670605, at *4 (D. Minn. Dec. 6, 2016), *report and recommendation adopted*, 2017 WL 102964 (D. Minn. Jan. 10, 2017); *see also McCoy v. Colorado Springs Hous. Auth.*, No. 18-CV-3137, 2019 WL 454099, at *4 (D. Neb. Feb. 5, 2019) (quoting *Edmunds*).

Given these elements, the Complaint has only one plausible candidate for a § 3617 claim: that once Jones informed Cihra in October 2019 that he believed that apartment personnel had treated him in a racist way, that eventually led to a meeting later that month where Jones was allegedly forced to sign a mutual-termination agreement.[3] For purposes of clarity, the Court notes that it considers the following allegations as key to this claim:

- "October 2019—I inform [Cihra] I believe I am being treated in a racist manner and didn't want to go rounds with her and [Giwa]. Megan proceeds to send share my e-mail with [Giwa], something

---

[3]   Jones suggests that Defendants also retaliated against him because of his complaints about noise and mice, and because he filed a neighbor-violation complaint. (*See* Compl. at 6.) Even if such retaliation occurred, it is not actionable under § 3617: the "protected activity" required for a § 3617 claim must be activity taken against allegedly discriminatory conduct. *See, e.g.*, *Favourite v. 55 Halley St., Inc.*, 381 F. Supp. 3d 266, 278 (S.D.N.Y. 2019) (stating that "protected activity" means "action taken to protest or oppose statutorily prohibited discrimination" (citation and internal quotation marks omitted)); *Smith-Jeter v. ArtSpace Everett Lofts Condo. Ass'n*, No. 17-CV-1857 (JPD), 2018 WL 6042312, at *4 (W.D. Wash. Nov. 19, 2018) (making same point), *aff'd*, 773 F. App'x 1009 (9th Cir. 2019); *Hamilton v. Lincoln Mariners Assocs. Ltd.*, No. 14-CV-1689 (WQH/NLS), 2014 WL 5180885, at *6 (S.D. Cal. Oct. 14, 2014) (same).

9

- she has never done before. . . . I inform [Giwa] that [Cihra] reacted in a racist manner and wanted to be viewed upon as a white woman in distress( with me being a aggressive black male."

- "[Giwa] is irate and sends me a e-mail informing me she and her supervisor, Juanita Sealy wanted to meet with me."

- "Oct 2019—I meet with [Giwa], the Resident Coordinator and [Sealy] the following day, it was awful."

- "[Giwa] does everything in her power to convince [Sealy] to evict me, which nearly happpened. [Sealy] intially wanted me to move in November but I inform her I had important litigation with my job and it will take time. I also inform her it will be cold and although I do want to move, I need more time but yet I shouldnt't be forced out. I am forced to sign a mutual termination agreement for December 31, 2019."

- "[Giwa] not only defamed my character but retailated because of my allegations of racism."

- "October 2019—A309 has had traffic, primarily at night and the early morning hours. I suspect drug activity, I am stressed out, sleep deprived and emotionally distressed. I am suffering from sever migrane headaches and my high blood pressure is being elevated. I know longer feel comfortable communicating with management because I know they will attempt to use it against me( my Mutual Termination Agreement states if I have another incident, I will be evicted) and I won't take any chances."

(Compl. 6.)

The Court thus recommends dismissal of any other § 3617 claim Jones seeks to press in the Complaint, but will allow this claim to go forward for now.[4]

---

[4] Notwithstanding this recommendation, Defendants—once properly served with the Complaint—may file a motion to dismiss in accordance with the Federal Rules of Civil Procedure if they believe that such a motion is appropriate.

### D. Title VII

As noted above, the Court construes Jones's reference to "Title VII" to refer to Title VII of the Civil Rights Act of 1964. (*See* Compl. 3.) The problem with any potential Title VII claim is that Title VII focuses on employer discrimination against employees. *See, e.g.*, 42 U.S.C. §§ 2000e-2, 2000e-3 (specifying various "unlawful employment practices"). Jones does not allege that Defendants employed him (*see generally* Compl.), so Title VII seems inapplicable here.

This also applies to any antiretaliation claim Jones might seek to press under Title VII – specifically, under 42 U.S.C. § 2000e-3. Under § 2000e-3(a), it is an "unlawful employment practice" for an employer to "discriminate against any employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." Unsurprisingly, given that nothing in the Complaint concerns employment practices, Jones has not alleged that he opposed a practice qualifying as an "unlawful employment practice," or that he has participated in a Title VII proceeding in any way. Jones thus cannot state an antiretaliation claim under § 2000e-3.

### E. Defamation

The final claims that this Court needs to address are Jones's potential state-law defamation claims. Under Minnesota law, a defamation claim's elements are "(1) that the defendant made a false and defamatory statement about the plaintiff; (2) that the statement was an unprivileged publication to a third party; (3) that the statement had a

11

tendency to harm the plaintiff's reputation in the community; and (4) that the defendant was at fault (at least negligent)." *McGuire v. Bowlin*, 932 N.W.2d 819, 823 (Minn. 2019) (citing *Britton v. Koep*, 470 N.W.2d 518, 520 (Minn. 1991)).

Federal courts considering whether a plaintiff has properly pled a state-law defamation claim apply federal procedural rules. *See Asay v. Hallmark Cards, Inc.*, 594 F.2d 692, 699 (8th Cir. 1979) (citing *Altoona Clay Products, Inc. v. Dun & Bradstreet, Inc.*, 367 F.2d 625, 629 (3d Cir. 1966)); *Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 1001 (D. Minn. 2006) (citing *Asay*). Federal courts generally prefer that plaintiffs plead defamation claims with specificity because "knowledge of the exact language used is necessary to form responsive pleadings." *Asay*, 594 F.2d at 699 (citing cases); *see also Sagehorn v. Indep. Sch. Dist. No. 728*, 122 F. Supp. 3d 842, 868 (D. Minn. 2015) (making same point).[5] "'While it is not necessary for the complaint to recite the exact language spoken, it is necessary that the plaintiff identify who made the defamatory statement and what was said.'" *Nleme v. Ford Motor Co.*, No. 15-470 (MJD/FLN), 2015 WL 6735200, at *4 (D. Minn. Oct. 1, 2015) (quoting *Cenveo Corp. v. CelumSolutions Software GMBH & Co. KG*, 504 F. Supp. 2d 574, 578 (D. Minn. 1997)), *report and recommendation adopted*, 2015 WL 6737006 (D. Minn. Nov. 3, 2015); *see also MN*

---

[5] For its part, Minnesota procedural law generally requires that a complaint provide any allegedly defamatory statements verbatim. *See, e.g.*, *Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 326 (Minn. 2000) (citing *American Book Co. v. Kingdom Pub. Co.*, 73 N.W. 1089, 1090 (Minn. 1898)); *Kapoor v. Brown*, No. A13-1402, 2014 WL 1516589, at *3 (Minn. Ct. App. Apr. 21, 2014) (citing *Moreno*).

*Airlines, LLC v. Glob. Aviation Servs. USA, Inc.*, No. 19-CV-0843 (PAM/SER), 2019 WL 5260480, at *2 (D. Minn. Oct. 17, 2019) (making similar point).

Reviewing the Complaint, the Court concludes that Jones's defamation allegations are not sufficiently specific. When Jones claims a given communication was defamatory, the Court can generally tell who supposedly made the relevant statement and to whom the statement was made. (*See* Compl. 4–6.) But Jones fails to provide any further explanation of the relevant defamatory statements. As a result, Jones has not plausibly pled that (for example) any Defendant has made a false statement, or a statement that tended to hurt Jones's reputation in the community. The Court therefore recommends that any defamation claims in the Complaint be dismissed without prejudice.

### F.   IFP Application

Because at least one claim in the Complaint survives screening under 28 U.S.C. § 1915(e)(2), and because the Court concludes that Jones qualifies financially for IFP status, the Court grants the IFP Application.

### RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.   The claims in Jones's Complaint (Doc. No. 1) based on 42 U.S.C. § 3604(b); Title VII of the Civil Rights Act of 1964 (including 42 U.S.C. § 2000e-3); and Minnesota state law concerning defamation are **DISMISSED WITHOUT PREJUDICE**.

2. The Complaint's claims based on 42 U.S.C. § 3617 are **DISMISSED WITHOUT PREJUDICE**, except for a § 3617 claim based on the allegations (on page 6 of the Complaint) that once Jones informed Defendant Megan Cihra in October 2019 that he believed that he was being treated in a racist fashion by management personnel at Elm's Apartments, this resulted in a meeting at which he was forced to sign a mutual-termination agreement concerning his apartment.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff Monty Jones's Application to Proceed in District Court Without Prepaying Fees or Costs (Doc. No. 2) is **GRANTED**.

2. Jones must submit a properly completed Marshal Service Form (Form USM-285) for each Defendant. If Jones does not complete and return the Marshal Service Forms within **30 days** of this Order's date, the Court will recommend that this matter be dismissed without prejudice for failure to prosecute. Marshal Service Forms will be provided to Jones by the Clerk's Office.

3. After the return of the completed Marshal Service Forms, the Clerk of Court is directed to seek waiver of service from Defendants, consistent with Rule 4(d) of the Federal Rules of Civil Procedure.

4. If a Defendant fails without good cause to sign and return a waiver within 30 days of the date that the waiver is mailed, the Court will impose upon that Defendant

the expenses later incurred in effecting service of process. Absent a showing of good cause, reimbursement of the costs of service is mandatory and will be imposed in all cases in which a defendant does not sign and return a waiver of service form. *See* Fed. R. Civ. P. 4(d)(2).

Dated: January 6, 2020                             *s/ Becky R. Thorson*
                                                   BECKY R. THORSON
                                                   United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).